DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Mary Dent | ) | CASE NO.  5:11-CV-000712 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| The Hartford Life & Accident Insurance | ) | |
| Company | ) | |
| | ) | |
| Defendant. | | |

This case was filed before the Court on April 11, 2011. In her Complaint, the plaintiff alleges that on November 9, 2009, the defendant arbitrarily and capriciously terminated her long term disability benefits in violation of ERISA § 502(a)(1)(B), and she seeks a *de novo* review. ECF 1. In addition, the plaintiff seeks reinstatement of her benefits and an order requiring the defendant to pay all future long term disability benefits as long as the plaintiff remains totally disabled. Id. Alternatively, the plaintiff requests that this matter be remanded.

The Court conducted a Case Management Conference in this case on July 12, 2011, in which counsel for both parties was present. ECF 12. The defendant filed the Administrative Record on August 5, 2011.[1] ECF 13. Both parties subsequently submitted their motions for judgment on the Administrative Record to the Court. ECF 25. Both parties then filed briefs in opposition to each other's motions. ECF 27.

---

[1] The Administrative Record can be found at ECF 13. All page references to the Administrative Record can be found at ECF 13.

(5:11 CV 00712)

For the reasons discussed below, the defendant's motion for judgment on the Administrative Record is GRANTED, and the plaintiff's motion for judgment on the Administrative Record is DENIED. The plaintiff's request that this matter be remanded is also DENIED.

## I. Facts

The plaintiff began her employment with Chase as an Operator Supervisor in July of 1987. HAR 2. As an employee of Chase, the plaintiff was a covered participant under Hartford Life & Accident Company's Long Term Disability policy, an ERISA-governed benefit plan as defined in 29 U.S.C. § 1002, *et seq*. The defendant administers the policy on behalf of Chase and has assumed all contractual liability under the policy. See ECF 1.

The plaintiff was diagnosed with cervical, thoracic, and lumbar degenerative disc disease with radiculopathy, major depression with suicidal ideation, and moderate right carpal tunnel syndrome. HAR 109.  On November 4, 2007, the plaintiff applied for Social Security Disability Benefits. HAR 442.

After applying for Social Security Disability benefits,[2] she applied for disability benefits from the defendant, and the defendant approved her claim for short term benefits.  The plaintiff later applied for long term benefits. In March of 2008, the defendant began to review the plaintiff's case to determine whether she was eligible for long term disability benefits. The Group Long Term Disability Policy defines "disabled" as:

---

[2] The plaintiff's application for Social Security Disability Benefits was granted by the Social Security Administration on October 28, 2008, with payments retroactive to May 2008. HAR 507. For the details surrounding the plaintiff's Social Security Award, see the section of this Opinion dealing with the defendant's consideration of that Award.

2

(5:11 CV 00712)

> "1. During the elimination period, you are prevented from performing one or more of the Essential Duties of Your Occupation;
> 2. for the 24 months following the elimination period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Indexed Pre-disability earnings;
> 3. after that, you are prevented from performing one or more of the Essential Duties of Any Occupation." HAR 30.

The Policy defines an "Essential Duty" as one that: "1. [is] substantial, not incidental; 2. is fundamental or inherent to the occupation; and 3. cannot be reasonably omitted or changed." HAR 30. Finally, "Your Occupation" is defined as "your occupation as it is recognized in the general workplace. 'Your Occupation' does not mean the specific job you are performing for a specific employer or at a specific location." HAR 33.

In connection with the plaintiff's claim for long term disability, one of the defendant's representatives interviewed the plaintiff in person on April 16, 2008. HAR 107. According to the defendant's notes from the interview, the plaintiff explained her medical condition in further detail. Id.  Based on the diagnoses and the interview, the defendant conditionally approved the plaintiff's claim for long term benefits on May 1, 2008. HAR 162.

On May 5, 2008, Mark Cyrus, the plaintiff's supervisor, submitted a Physical Demands Analysis (PDA) of the essential duties of the plaintiff's position. HAR 454-455. In the PDA, Cyrus identified the physical demands of an Operator Supervisor as follows: sit for up to two hours at a time and up to five hours every day, and stand and/or walk for up to 30 minutes at a time and up to two hours per day. Id.  In addition, the PDA stated that an Operator Supervisor must occasionally

3

(5:11 CV 00712)

reach above the shoulder, constantly reach at the waist level, and occasionally reach below the waist. HAR 455.

The defendant continued to pay the benefits until 2009, when it conducted a review of the plaintiff's condition. As part of that review, the defendant obtained medical records from the plaintiff's visits to several doctors. Dr. Michael Grimes, the plaintiff's primary care physician, completed an Attending Physician's Statement (APS), in which he stated he had diagnosed the plaintiff with degenerative disc disease, fibromyalgia, and depression. HAR 427. Dr. Grimes did not complete the Functional Capabilities Assessment portion of the APS. HAR 428. The plaintiff also visited Dr. Mark Grubb, an orthopedic surgeon, who completed an APS on June 11, 2009. HAR 302-303.  In the APS,  Dr. Grubb stated he had diagnosed the plaintiff with a herniated disc and degenerative disc disease, but he left the Functional Capabilities section of the APS blank. HAR 302.

In addition, the plaintiff visited Dr. Arsal Ahmad and Dr. Vladimir Djuric,  physical medicine and rehabilitation specialists, who diagnosed her with fibromyalgia, cervical spondylosis, and probable lumbar degenerative disease with possible radiculopathy. HAR 348.  In his APS, completed on June 9, 2009, Dr. Ahmad stated that the plaintiff could frequently reach above the shoulder and at waist or desk level and occasionally reach below the desk level. HAR 338. Finally, the plaintiff visited Dr. Gina Glenn, a psychiatrist who determined the plaintiff was not a risk to herself or others, was alert and oriented, and had good attention and concentration, intact memory, and fair insight and judgment. HAR 311.

4

(5:11 CV 00712)

Based on a review of the plaintiff's medical records, Christie Mendez, an Ability Analyst for the defendant, concluded that it was likely that the plaintiff could perform the duties of her occupation. However, because Dr. Ahmad stated that the plaintiff could "frequently" reach at desk level, Mendez sought clarification from Mark Cyrus as to how often the plaintiff's occupation required her to reach at desk level.[3] HAR 75. According to Mendez's notes of the conversation, Cyrus informed her that "an operator supervisor is required to perform reaching at waist/desk level on a pretty frequent basis. However...it is not constant." HAR 73. On October 2, 2009, Mendez recommended the plaintiff's benefits be terminated. HAR 71.

Following that recommendation, the defendant followed up with Dr. Grubb, who had not completed the Functional Capabilities section of his APS.  HAR 73.  On November 2, the defendant sent Grubb a letter informing him of the restrictions and limitations provided by Dr. Ahmad and asking if he agreed with those restrictions. HAR 279.  Three days later, Grubb responded and indicated he agreed. Id. The defendant then sent the plaintiff a letter informing her that her benefits were being terminated because she longer met the policy's definition of "disability" beyond November 6, 2009. HAR 138-143.

On December 3, 2009, the plaintiff administratively appealed the defendant's decision. HAR 136. After the appeal was filed,  Dr. Ahmad mailed a letter to the defendant, in which he stated that he believed the plaintiff was disabled and was not capable of performing any remunerative employment. HAR 272.  However, Ahmad subsequently issued an APS, which updated his June 9, 2009 APS and placed further restrictions on the plaintiff's activities. HAR 270.  In the updated

---

[3] The PDA completed by Cyrus in May 2008 stated that an Operator Supervisor had to "constantly" reach at desk level.

5

(5:11 CV 00712)

APS,[4] Ahmad indicated that the plaintiff could not do any reaching with her right hand and could do occasional reaching with her left hand. Id.  The defendant referred all of the plaintiff's medical information to MLS Group in order to obtain an independent review.

The review was conducted by Dr. Mark Kaplan and Dr. Eric Kaplan. HAR 185-187.  Dr. Mark Kaplan reviewed the plaintiff's medical records and spoke to Dr. Ahmad and Dr. Djuric. According to Dr. Kaplan's notes of the conversation, Dr. Ahmad stated that the plaintiff "would be capable of sedentary level work with restrictions for the right upper extremity due to carpal tunnel syndrome." HAR 192. According to Dr. Kaplan's notes, Dr. Djuric stated that the plaintiff "was probably able to do sedentary level work." HAR 193.

After conducting his medical review, Dr. Kaplan concluded that the plaintiff "would be expected to have been able to sustain a regular work schedule, eight hours per day, five days a week" with the following restrictions and limitations:

> (1) standing or walking up to two hours total with a five-minute break every 30 minutes;
> (2) sitting up to eight hours total with a five-minute break every hour;
> (3) repetitive keying up to 15 keystrokes/minute up to 30 minutes at a time and two hours total;
> (4) feeling, fingering, gripping and using light tools (pen, scissors, etc.,) with the right hand up to two hours total with a five minute break every 20 minutes;
> (5) right wrist repetitive motion activities up to four times per hour;
> (6) lifting, pushing, and pulling up to 5 lbs. frequently and up to 10 lbs occasionally; and
> (7) never balance, climb ladders, squat, kneel, pedal, or engage in extreme right wrist flexion or extension. HAR 194-195.

---

[4] Dr. Ahmad issued his updated APS on February 11, 2010.

6

(5:11 CV 00712)

Dr. Eric Kaplan reviewed the plaintiff's medical records with regard to her psychological condition and determined that although her psychological symptoms included a sad mood, reduced energy, and insomnia, she would not be restricted or limited from working full-time based on her psychological condition. HAR 204.

After considering the records of the review, the defendant concluded that the restrictions and limitations set forth by Dr. Mark Kaplan were consistent with the physical demands of her occupation and would not prevent her from performing the essential duties of her occupation. HAR 59.  The defendant also considered the plaintiff's approval for Social Security disability benefits, but concluded that its standard for determining whether a person is disabled differs from that of the Social Security Administration, and the totality of the available medical record showed that the plaintiff no longer met the defendant's definition of "disability." HAR 118.  Accordingly, the defendant upheld its decision to terminate the plaintiff's benefits. HAR 177.

## II. Standard of Review

Federal courts generally review a plan administrator's denial of ERISA benefits *de novo*, unless the plan grants the administrator "discretionary authority to interpret the terms of the plan and to determine benefits." *Glenn v. Metro Life Insurance Co.*, 461 F.3d 660, 666 (6th Cir. 2006). If such discretion is granted to the plan administrator, the court will review the decision to terminate benefits under the "arbitrary and capricious" standard. Id. This standard "is the least demanding form of judicial review of administrative action....When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). Therefore, a court

7

(5:11 CV 00712)

will uphold a decision to deny benefits "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance Standard Life Ins. Co.*, 594 F.3d 496, 500 (6th Cir. 2010).

The arbitrary and capricious standard of review is not, however, a "rubber stamp of [the] administrator's decision." *Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 165 (6th Cir. 2007). Under this standard, a court is required to review "the quality and quantity of the medical evidence and opinions on both sides of the issues." Id. The plaintiff ultimately bears the burden of proof in showing that the decision to terminate benefits was arbitrary and capricious. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).

The plaintiff argues that where a plan authorizes an administrator "both to decide whether an employee is eligible for benefits and to pay those benefits, it creates 'an apparent conflict of interest.'" Ptf. Mot. at 2.  The plaintiff further contends that the Court must recognize this conflict and give it appropriate consideration under the arbitrary and capricious standard. Id. In *Cox v. Standard Ins. Co.*, the Sixth Circuit held that a deferential standard of review continues to apply in the face of a conflict, and the conflict is only one factor a court will consider when determining whether a denial of benefits was arbitrary and capricious. 585 F.3d 295, 298 (6th Cir. 2009).  When determining whether a conflict of interest influenced a denial of benefits, "the reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 (6th Cir. 2004).

In this case, the fact that the defendant served as both the administrator and payer of claims will be considered as a factor in the Court's review. However, this fact does not change the standard

8

(5:11 CV 00712)

of review. As part of its analysis under the arbitrary and capricious standard, the Court will examine the record to determine if the conflict influenced the defendant's decision to terminate the plaintiff's benefits.

## III. Law and Analysis

### A. Termination of Benefits not Arbitrary and Capricious

The Sixth Circuit has stated that "the ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).  Therefore, the issue in this case is not whether the individual actions of the defendant were arbitrary and capricious, but whether the defendant's decision to terminate the plaintiff's long term disability benefits was arbitrary and capricious.

The plaintiff argues that the defendant's termination of her benefits was arbitrary and capricious because: 1. The defendant failed to perform a vocational review of the plaintiff's own occupation and how it is performed in the national economy; and 2. The defendant changing the job description shows a conflict of interest constituting an arbitrary and capricious decision.[5]

### 1. Vocational Review of plaintiff's essential occupational duties not required

As to the plaintiff's first argument, the plaintiff has offered no case law to support her argument that the defendant was required to seek out a vocational expert to define the physical

---

[5] Although the plaintiff argues that the defendant sought to change the plaintiff's "job description," what Mark Cyrus completed was a PDA, and not a job description. The Court will hereafter refer only to the PDA. While the plaintiff contends that the defendant changed the PDA, the record shows that the defendant asked the plaintiff's employer for clarification of the PDA, and the employer subsequently clarified the PDA.

9

(5:11 CV 00712)

demands of the plaintiff's occupation. Further, the defendant's Group Insurance Policy does not require the defendant to utilize the services of a vocational expert.

In fact, the case law on this subject contradicts the plaintiff's argument. The Sixth Circuit has  specifically rejected the argument that a plan administrator must consider vocational evidence before making a final eligibility decision. *Burge v. Republic Eng. Prods., Inc.*, 432 Fed. Appx. 539, 550 (6th Cir. 2011). Because a vocational review was not required by the plan, and the Sixth Circuit has declined to impose this requirement, the defendant's failure to seek a vocational review does not contribute to a showing that the defendant's decision to deny benefits was arbitrary and capricious.

2. Clarifying PDA not arbitrary and capricous

Turning to the plaintiff's second argument, the plaintiff contends that the defendant approached the plaintiff's employer with the intention of getting her PDA changed so it could terminate her benefits, and this action demonstrates that defendant's action was arbitrary and capricious. Again, the plaintiff does not support this argument with any case law, and her argument lacks merit.

The defendant asked Mr. Cyrus to clarify the plaintiff's PDA in order to determine whether Dr. Ahmad's restrictions would prevent the plaintiff from performing an essential duty of her occupation. The plaintiff's position is that the defendant should not have sought this clarification. First, the plaintiff argues that clarification was not necessary because when completing the PDA, Mr. Cyrus checked all the boxes and answered all relevant questions. Id. at 12. The plaintiff also points out that the defendant then accepted the PDA without question, and the only item it later sought clarity on just happened to be the same term that needed to change in order for the benefits

10

(5:11 CV 00712)

to be denied. Id. The plaintiff argues that if the defendant wanted to clarify the plaintiff's PDA, it should have sought the services of a vocational analyst. Id.

The fact that Mr. Cyrus previously completed the PDA does not show that the defendant later acted improperly when it sought clarification of the PDA. It was not improper for the defendant to seek clarification of any part of the PDA, and it was, in fact, part of the "deliberate, principled reasoning process" that is necessary to show that a decision to deny benefits is not arbitrary and capricious. *See Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 165 (6th Cir.  2007).

For the same reason, the plaintiff's argument that the defendant should not have sought clarification because it had previously accepted the PDA without question also lacks merit. As the defendant points out, the PDA was drafted in May 2008, more than a year before Dr. Ahmad's assessment of the plaintiff. Deft. Mot. At 9, ECF 27. Questions pertaining to the PDA may arise as circumstances change. It was not arbitrary and capricious for the defendant to gather all of the information it needed before deciding whether to terminate the plaintiff's long term disability benefits.

The plaintiff's position that the defendant did not seek clarity on any other fields on the PDA also does not show that the defendant acted arbitrarily and capriciously. Seeking clarity on one field only shows that the field in question was the only one the defendant needed to clarify.

The contention that the defendant should have sought out the services of a vocational analyst has already been addressed. Again, the plaintiff cites no case law to support this argument, and the current case law in the Sixth Circuit does not impose this requirement on plan administrators. This arrangement was also not required in the terms of the Group Long Term Disability Policy.

11

(5:11 CV 00712)

The decision to seek clarification on the plaintiff's PDA appears to have been part of the defendant's deliberate and principled reasoning process in deciding whether to continue to grant the plaintiff's disability benefits, and does not support a conclusion that the defendant's ultimate decision to uphold the termination of the plaintiff's benefits was arbitrary and capricious.

**B. Upholding Termination of Benefits not Arbitrary and Capricious**

The plaintiff next contends that the defendant's upholding of its decision to terminate her benefits   was arbitrary and capricious for the following reasons: 1. The defendant failed to adequately consider objective medical evidence showing problems of chronic pain supporting disability; 2. The defendant mischaracterized Dr. Ahmad's opinions and restrictions regarding the plaintiff; 3. defendant failed to perform a vocational review after receiving Mark Kaplan's restrictions; and 4. defendant did not adequately consider the plaintiff's Social Security Award.

1. Defendant did not fail to consider objective medical evidence

While pain could indeed become so severe that it would prevent a person from performing the essential duties of her occupation, the plaintiff has not shown that the severity of her pain rose to that level. The plaintiff is correct that some of the physicians she visited mentioned her pain in their reports, but none of them stated that the pain would prevent her from performing the essential duties of her occupation.

In addition, the independent review undertaken by Drs. Mark and Eric Kaplan did not conclude that the plaintiff's pain prevented her from performing the essential duties of her occupation. Dr. Mark Kaplan and plaintiff's doctors agreed that the plaintiff could work subject to certain restrictions and limitations, and that pain did not prevent plaintiff from working. Contrary

12

(5:11 CV 00712)

to plaintiff's assertions, the record reflects that the defendant did consider the plaintiff's pain as part of its deliberate and principled reasoning process, and concluded that pain did not prevent plaintiff from performing the essential duties of her occupation.

2. Dr. Ahmad's opinions and restrictions regarding the Plaintiff not mischaracterized

The plaintiff has not shown that the defendant intentionally mischaracterized Dr. Ahmad's statements in order to justify its upholding of its decision to terminate the plaintiff's benefits. The plaintiff points out that in its final letter, the defendant stated, "the information indicates that Dr. Ahmad and Dr. Djuric agreed that Ms. Dent could perform at least sedentary work, and we are not in disagreement with their opinion." Ptf. Mot. at 14, ECF 25. The plaintiff's objection is that, according to Dr. Mark Kaplan's notes, what Dr. Ahmad actually said was that the plaintiff might be able to perform sedentary work with right extremity limitations. Dr. Kaplan's notes also stated Dr. Djuric said the plaintiff was "probably able to do sedentary level work." HAR 193.

While Dr. Kaplan's notes do not contain exact quotes by either Dr. Ahmad or Dr. Djuric, the summary of his conversations with both doctors indicate that they believed the plaintiff was at least capable of working under the restrictions and limitations set out by Dr. Ahmad, which is not inconsistent with the APS documents completed by Dr. Ahmad. Therefore, there was evidence in the record from which Dr. Kaplan could reasonably conclude that the plaintiff could perform "at least sedentary work." No matter how Dr. Ahmad's statements were characterized, Dr. Kaplan reached substantially the same conclusion as Dr. Ahmad regarding the plaintiff's ability to work with certain restrictions.

13

(5:11 CV 00712)

The plaintiff also points to Dr. Ahmad's letter from December 3, 2009, stating that the plaintiff was incapable of performing any remunerative employment. HAR 272. However, Dr. Ahmad also subsequently issued an updated APS[6] in which he placed additional restrictions on the plaintiff's activities. The plaintiff argues that the defendant "disregarded Dr. Ahmad's clear statement of the Plaintiff's disability...." However, the record reflects that the defendant considered Ahmad's statements along with plaintiff's entire medical record, including Dr. Ahmad's original APS and updated APS, Ahmad's and Djuric's statements to Dr. Kaplan that the plaintiff could perform "at least sedentary work," and Dr. Grubb's assessment of plaintiff's restrictions, in its review of plaintiff's disability status.

Taking into account the totality of the record, the Court finds that the defendant engaged in a deliberate and principled reasoning process and had a substantial basis for concluding that plaintiff's restrictions did not prevent her from performing the physical activities of her occupation as described by Mark Cyrus in the PDA he prepared and in his subsequent clarification of those activities. Accordingly, the Court concludes that defendant's decision to uphold its termination of benefits was not arbitrary and capricious.

## 3. Vocational Review of Dr. Kaplan's restrictions not required

The plaintiff contends that the defendant did not analyze whether the restrictions set forth by Dr. Mark Kaplan prevented the plaintiff from returning to work. In making this argument, the

---

[6] Dr. Ahmad's original APS issued before plaintiff's benefits were terminated indicated that plaintiff could reach at her waist frequently, along with certain other restrictions. Dr. Ahmad's updated APS issued after plaintiff's benefits were terminated indicated that plaintiff could reach at her waist occasionally, along with certain other restrictions.

14

(5:11 CV 00712)

plaintiff relies on the lack of an internal note discussing the restrictions. Ptf. Mot. at 15, ECF 25. The plaintiff's position is that the absence of a written analysis shows that no review was conducted. In its final letter to the plaintiff, the defendant stated  the "restrictions and limitations indicated by Dr. Mark Kaplan are consistent and compatible with [the plaintiff's] occupational physical demands and would not prevent her from performing the Essential Duties of Her Occupation." HAR 117.

The absence of a written analysis does not show that the defendant failed to conduct a review. As the defendant correctly notes, "no Plan provision or case law requires [the defendant] (or any insurer) to provide supporting written documentation for every statement or conclusion in a denial letter." Deft. Mot. at 7, ECF 27. Further, the documentation in the record supports the defendant's conclusion that the restrictions were "consistent and compatible" with the plaintiff's physical occupational demands.

The plaintiff next contends that even if the restrictions were reviewed, the services of a vocational expert were required to determine if the plaintiff could return to her occupation. As discussed, neither the Group Long Term Insurance Policy nor the Sixth Circuit law requires the defendant to procure the services of a vocational expert in order to make this determination. The case the plaintiff cites to support this argument also does not require a plan administrator to seek out a vocational expert. Accordingly, the defendant's actions in not hiring a vocational expert do not show that the decision upholding the  termination of  the plaintiff's benefits was arbitrary and capricious.

15

(5:11 CV 00712)

4. Plaintiff's Social Security Award considered

The plaintiff next contends that the defendant failed to adequately consider plaintiff's Social Security Disability award when determining whether to uphold its decision to terminate her benefits. Ptf. Mot. at 17, ECF 25.  The plaintiff concedes that the defendant mentioned the plaintiff's Social Security Disability, but she argues that a blanket statement in the defendant's denial of her appeal does not constitute adequate consideration. Ptf. Mot. at 18, ECF 25.

A plan administrator's failure to address a beneficiary's Social Security Disability award in its decision to terminate ERISA benefits is a factor a court will consider when determining whether a such a decision is arbitrary and capricious. *Morris v. American Electric Power Long-Term Disability Plan*, 399 Fed. Appx. 978, 985 (6th Cir. 2010). If the plan administrator "(1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the [Social Security Administration] on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious." *Bennett v. Kemper Nat. Services, Inc.*, 514 F.3d 547, 554 (6th Cir. 2008).

In this case, the defendant, in its Group Long Term Insurance Policy, states that upon request, a beneficiary must apply for Social Security Disability benefits. HAR 26. The defendant requested that the plaintiff apply for these benefits in its May 1, 2008 letter granting her long term benefits. However, the plaintiff had already applied. HAR 164. The defendant subsequently sent the plaintiff a letter, dated November 12, 2008, stating that it had become aware of her Social Security Disability award, reminding her that her ERISA benefits would be reduced by the amount of her

16

(5:11 CV 00712)

Social Security Disability benefits, and requesting that she repay the amount the defendant had overpaid ($8,120.33) since the plaintiff began receiving Social Security benefits. HAR 157. This is evidence that the defendant both encouraged the plaintiff to apply for Social Security Disability benefits and financially benefitted from her receipt of those benefits.

Even with this evidence, however, it must still be shown that the defendant failed to explain why its decision differed from that of the Social Security Administration in order to support a finding that the defendant's decision was arbitrary and capricious. That did not occur here. In its letter to the plaintiff's attorney explaining its decision upholding termination of benefits, the defendant stated that while it considered her Social Security Disability award as one piece of relevant evidence in deciding to terminate benefits, the Social Security Administration's standard for whether someone is disabled is different from the defendant's standard. HAR 118. The defendant said that the Social Security Administration uses federal criteria to measure disability, while it must rely on the terms of its Group Long Term Disability Policy. Id. It also pointed out that while the Social Security Administration conducts follow-up disability reviews every one, three, or five years, depending on the severity of the diagnosis, the defendant conducts such reviews every year. Id. The defendant stated that upon conducting its yearly review, it examined the plaintiff's medical records and obtained APS' from the physicians she had visited, including Dr. Ahmad. Defendant indicated her Social Security award was considered during this review, but based on the totality of the medical evidence, defendant determined that the plaintiff no longer met the Policy's definition of "disability." Id.

17

(5:11 CV 00712)

Even though the defendant encouraged the plaintiff to apply for Social Security Disability benefits and financially benefitted from her receipt of those benefits, it did not fail to offer an explanation as to why its decision differed from that of the Social Security Administration. Accordingly, this factor does not weigh in favor of a conclusion that the defendant's decision to uphold termination of plaintiff's ERISA benefits was arbitrary and capricious.

As previously stated, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). Here, the defendant has offered a reasoned explanation for upholding its termination of the plaintiff's benefits, and it has shown that it engaged in a deliberate and principled reasoning process. The defendant relied on medical examinations from the plaintiff's physicians, as well as the independent review conducted by Drs. Mark and Eric Kaplan, to reach its conclusion that the plaintiff was capable of performing sedentary work, which was consistent with the conclusion the plaintiff's physicians reached. The defendant also adequately considered the fact that the plaintiff had been awarded Social Security Disability benefits. The defendant's decision was therefore not arbitrary and capricious.

## C. Defendant did not fail to comply with plan requirements

The plaintiff next contends that, as an alternative to the reinstatement of her benefits, this matter should be remanded because the defendant failed to comply with the procedural requirements of the Group Insurance Policy. Specifically, the plaintiff alleges the defendant improperly focused on the requirements and responsibilities of the plaintiff's specific position, instead of focusing on

18

(5:11 CV 00712)

how the position is performed in the "general work place." Ptf. Mot. at 10, ECF 25. [7] Again, the case law contradicts this position. In *Burtch v. Hartford Life and Acc. Ins. Co.*, the Fifth Circuit stated that it is permissible for a payer of benefits to consider the specific duties of a beneficiary's job "as an example of the duties of such a position in the general economy...." 314 Fed. Appx. 750, 756 (5th Cir. 2009). This proposition has also found support in the 3rd Circuit.[8] Here, as in *Burtch*, the defendant used the plaintiff's specific duties as an example of the duties of such a position in the general economy. The Group Insurance Plan also did not forbid the use of the plaintiff's duties as such an example. The Court therefore declines to remand this matter.

**D. Conflict of interest did not influence defendant's decision**

As previously noted, the fact that the defendant acted as both administrator and payer of benefits creates an inherent conflict of interest that the Court will consider as one factor in its determination of whether the defendant acted arbitrarily and capriciously in terminating the plaintiff's benefits. When determining whether a conflict of interest influenced a denial of benefits, "the reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 (6th Cir. 2004).

The plaintiff argues several examples show that the defendant's conflict of interest influenced its decision to terminate the plaintiff's benefits. First, the plaintiff contends that the defendant "intentionally sought to change the definition of [p]laintiff's occupation under the guise of needing

---

[7] As previously stated, the Group Long Term Disability Policy defines "Your Occupation" as: "your occupation as it is recognized in the general workplace. 'Your Occupation' does not mean the specific job you are performing for a specific employer or at a specific location." HAR 33.

[8] *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 386-87 (3rd Cir. 1999).

19

(5:11 CV 00712)

'clarity.'" This is not an accurate statement. The defendant did not seek to change the PDA, but asked plaintiff's employer to clarify exactly what tasks the plaintiff was required to perform in light of Dr. Ahmad's proposed restrictions. There is not sufficient evidence that this action was motivated by a conflict of interest.

The plaintiff also takes the position that the defendant's action in looking at the duties of her specific position, rather than looking at how the position is performed in the general work place, was motivated by its conflict of interest. The plaintiff contends that this action shows that the defendant's dual role in the administration and paying of benefits caused it to look for a reason to terminate her benefits. As previously mentioned, however, it is permissible for a payer of benefits to look to the duties and responsibilities of a beneficiary's specific position as an example of how the position is performed in the general workplace. Without more, the defendant's action does not appear to have been motivated by its conflict of interest.

The plaintiff next argues that the defendant manipulated Dr. Ahmad's opinions of her condition in order to deny her benefits. Again, while Dr. Kaplan's notes do not contain direct quotes, Dr. Ahmad's conclusions in his APS are consistent with the statement in the notes that the plaintiff could perform "at least sedentary work." That conclusion was also consistent with the medical opinions of plaintiff's other physicians. There is therefore no evidence of intentional manipulation.

The plaintiff argues that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements." Ptf. Mot. at 19, ECF 25 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003)). The plaintiff then contends that the defendant was "acting

20

(5:11 CV 00712)

under a conflict of interest because it had a clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [long term disability] benefits." Id. The plaintiff acknowledges that the defendant did not directly contract with the reviewers in this case, but she argues that the defendant had a strong incentive to utilize MLS' vendor. To support this position, the plaintiff notes that the defendant has used MLS five-hundred and ninety times within the past two years, with Drs. Mark and Eric Kaplan being assigned to "a good number of those claims." Id.

While it is true that the U.S. Supreme Court in *Black & Decker* acknowledged that physicians retained by benefit plans may have an incentive to reach a conclusion that a beneficiary is not disabled, it also declined to endorse a rule that would require plan administrators to afford special deference to the opinions of treating physicians, noting that in close cases, they may favor a finding that their patients are disabled. *Black & Decker*, 538 U.S. at 832. In this case, the defendant did not accord special deference to either its reviewing physicians or the plaintiff's treating physicians. Instead, it relied on the opinions of both in reaching its conclusion that the plaintiff was capable of working subject to certain restrictions. This fact does not show bias, but actually shows that the defendant conducted a full review of the plaintiff's medical records.

Even though it is true that the defendant used MLS Group for its reviews 590 times in two years, this is not evidence of bias. As the defendant points out, it does not choose which reviewers are assigned to its claims, and the reviewers must disclaim in their reports any conflict of interest in conducting their review. Def. Mot. at 11, ECF 27. Also, as the defendant notes, it referred the plaintiff's case to MLS in August of 2010, before the majority of the other referrals to MLS were

21

(5:11 CV 00712)

made. Id. The plaintiff does not provide support for the proposition that utilizing a reviewer 590 times is evidence of bias. As previously noted, Drs. Mark and Eric Kaplan conducted a fair and thorough review of all of the plaintiff's medical records, as well as the reports from her attending physicians, and they reached the same conclusion as her physicians. There is no evidence that their conclusion was motivated by a conflict of interest.

### IV. Conclusion

For the reasons discussed above, the defendant has offered a reasoned explanation, supported by substantial evidence, for its decision to uphold the termination of the plaintiff's ERISA benefits, and it has shown that it engaged in a deliberate and principled reasoning process in reaching that decision. Accordingly, the Court concludes that the defendant's decision to terminate the plaintiff's benefits was not arbitrary and capricious. Therefore, the defendant's motion for judgment on the Administrative Record is GRANTED, and the plaintiff's motion for judgment on the Administrative Record is DENIED. The plaintiff's request that the matter be remanded is also DENIED.


IT IS SO ORDERED.


 June 11, 2012                                  s/ David D. Dowd, Jr.
Date                                            David D. Dowd, Jr.
                                                U.S. District Judge

22